**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                           CR No. 00-1341 MV


EMANUEL OHIRI,

      Defendant.


**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Evidence **[Doc. No. 22]** and Defendant's Motion Dismiss Counts 1-7, 9-19, and 21-23 for Lack of Subject Matter Jurisdiction and for Failure to Charge an Offense **[Doc. No. 17]**. The Court having considered the motions, briefs, relevant law and being otherwise fully informed, finds that Defendant's Motion to Dismiss Counts 1-7, 9-19, and 21-23 for Lack of Subject Matter Jurisdiction and for Failure to Charge an Offense **[Doc. No. 17]** is not well taken and will be **DENIED**, and that the Defendant's Motion to Suppress Evidence **[Doc. No. 22]** is well taken and will be **GRANTED**.

**BACKGROUND**

On November 13, 1998, federal and state agents conducted a search of General Waste Corporation ("GWC"), in Albuquerque, New Mexico. The Government executed the search

1

pursuant to two federal search warrants, which covered the main office of GWC as well as its nearby storage area, in which several trucks were parked. The warrants did not extend to the search of any persons on the premises.

EPA and New Mexico Environmental Department Agents arrived at GWC at approximately 8:40 a.m. on November 13, 1998. Emmanuel Ohiri, the Chief Executive Officer of GWC, was on the premises when the warrant was executed. Mr. Ohiri was encountered by one Agent Morrow, who located him by entering Mr. Ohiri's bathroom, with his gun drawn. The search proceeded into the morning without incident. While searching the storage area, EPA Agents located a truck that could not be opened between 9:00 a.m. and 10:00 a.m. Mr. Ohiri assisted the agents conducting the search by prying the truck open, crawling inside, and eventually opening the entire door from within so that the contents could be clearly seen from outside the truck. Agent LeScouarnec of the New Mexico Environmental Department testified that he saw a 55-gallon drum in the truck which was marked with a hazardous waste label. He also noticed Mr. Ohiri quickly moving his hand away from his pocket while inside the truck. After some time had passed, Agent LeScouarnec noticed that the 55-gallon drum was no longer marked with a hazardous waste label, and reported the events to Agents Tidmore and Kohl, who in turn notified EPA Special Agent Vernon Jackson.

By this time, Mr. Ohiri had returned to the main facility, several blocks away. Agent Jackson located Mr. Ohiri in the main facility, and requested that Ohiri go into his office and empty his pockets. EPA Special Agent Jay Green accompanied them. Agent Green testified that he was armed at that time, and that Agent Jackson was also armed. Both agents kept their weapons in their holsters at their side. They were clothed in EPA enforcement jackets.

The door to Mr. Ohiri's small office was open, and the agents were standing between Mr. Ohiri and the door, approximately four to five feet away from him. No other persons were in the office. The agents requested that Mr. Ohiri empty his pockets. After he emptied his front pockets, he was asked to turn them inside out. Mr. Ohiri complied with the request. He was then asked to empty his back pockets. Agent Green testified that it was clear that "he had cupped something in one of his hands. We asked him to turn out his hand." (R. at 136.) Mr. Ohiri then placed a portion of a hazardous waste label on the desk in front of him.

These events occurred without a search warrant that encompassed Ohiri's person and without a recitation of Ohiri's rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). At the evidentiary hearing, Agent Green testified that while Mr. Ohiri had not been placed under arrest at this time, he would not have been free to leave after Agents Jackson and Green followed him into his office. These events, beginning with the Agents' entry in Mr. Ohiri's office until the label was retrieved from Mr. Ohiri's pocket, occurred between approximately 9:00 a.m. and 11:00 a.m.

Upon recovery of the waste label, EPA Agent Guy Tidmore determined that the materials contained in the 55-gallon drum had been labeled as hazardous waste. The drum was determined to hold spent non-halogenated solvents from nonspecific sources, with a flashpoint below 140 degrees Fahrenheit. Although the label was retrieved at approximately 11:00 a.m., Agent Tidmore did not begin opening the canisters until roughly four hours later. The materials improperly stored at GWC later tested hazardous for the characteristic of ignitability.

Mr. Ohiri argues that the statute under which he is charged, 42 U.S.C. §6928(d), is supplanted by state law, and that the federal government is thereby prevented from prosecution of

this case.  Ohiri further claims that the hazardous waste label, his act of producing the label, and the comments he made at the time of production were obtained in violation of his Fourth and Fifth Amendment rights, and seeks to have the following suppressed: 1) Ohiri's act of producing the label; 2) oral statement made by Ohiri when those items were produced; and 3) the items themselves as fruit of the poisonous tree.  The Government argues that all three should be admitted under four different theories: 1) exigent circumstances; 2) no *Miranda* warnings were necessary due to lack of arrest or interrogation; 3) Ohiri's act of emptying his pockets was not testimonial; and 4) valid search warrants covered the search of  Ohiri's pockets.

## STANDARDS

I.    *Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to Charge an Offense*

Ohiri's Motion to Dismiss turns on issues of statutory interpretation.  To determine the meaning of a statute, the court must first look to the plain language of the statute itself. *Gudenkauf v. Stauffer Communications, Inc.*, 158 F.3d 1074, 1079 (10th Cir. 1998).  The court must examine the language in question in the context of the statute as a whole.  *Id.*  If the language is ambiguous, the court may consider the statute's legislative history as an aid in determining its meaning.  *Id.*   Agency interpretation is given deference, unless the agency's interpretation is contrary to express Congressional intent.  *Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 824 (10th Cir. 2000).   "Statutory interpretations that 'render superfluous other provisions in the same enactment' are strongly disfavored." *National Endowment for the*

*Arts v. Finley*, 524 U.S. 569, 609 (1998) (*citing Freytag v. Commissioner*, 501 U.S. 868, 877 (1991)).

II.     *Motion to Suppress Evidence*

A.      Generally

The Fourth Amendment protects individuals from unreasonable searches and seizures. *See U.S. Const. Amend. IV.* The central question is one of reasonableness. *See Texas v. Brown*, 460 U.S. 730, 739 (1983). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967). However, "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Illinois v. McCarthur,* 531 U.S. 326 (2001) (citing *Pennsylvania v. Labron,* 518 U.S. 938, 940-941, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996)) (per curiam) (search of automobile supported by probable cause); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (suspicionless stops at drunk driver checkpoint); *United States v. Place,* 462 U.S. 696, 706, 103 S.Ct. 2637 (temporary seizure of luggage based on reasonable suspicion); *Michigan v. Summers*, 452 U.S. 692, 702-705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (temporary detention of suspect without arrest warrant to prevent flight and protect officers while executing search warrant); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (temporary stop and limited search for weapons based on reasonable suspicion)).

B.    Exigent Circumstances

"Warrantless searches are pre se unreasonable under the Fourth Amendment, subject only to a few, well-established exceptions." *U.S. v. Nicholson*, 144 F.3d 632, 638 (10th Cir. 1998). Exigent circumstances may permit temporary warrantless seizure. *Warden, Md. Penitentury v. Hayden*, 387 U.S. 294, 298-299 (1967).   Exigent circumstances exist if there is imminent danger of the destruction of evidence. *Cupp v. Murphy*, 412 U.S. 291, 294-96 (1973).  Exigent circumstances also exist where a warrantless search is necessary to protect the safety of law enforcement officers or the public. *U.S. v. Erb*, 596 F.2d 412, 417-20 (10th Cir. 1979).  "The scope of the warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement." *Cupp v. Murphy*, 412 U.S. at 295.

Cases establishing the exigent circumstances exception establish that the officers must take the least intrusive steps available to address the exigency. *See Winters v. Board of County Commissioners*, 4 F.3d 848, 854 n. 7 (10th Cir. 1993);  *U.S. v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988).  Brief, warrantless detentions of suspects in order to allow time for a warrant to be obtained are permitted where they are "both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests." *Illinois v. McArthur,* 531 U.S. 326 (2001).

"[A]s an exception to the warrant requirement, exigent circumstances must be jealously and carefully drawn." *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998).  The government bears the burden of establishing the existence of exigent circumstances. *United States v. Chavez*, 812 F.2d 1295, 1299 (10th Cir. 1987).

C.    _Miranda_ Requirements

The Fifth Amendment, as interpreted in _Miranda_, requires suppression of communications made by a defendant in response to custodial interrogation when the defendant has not first been informed of certain constitutional rights. *See Dickerson v. U.S.*, 120 S.Ct. 2326, 2331, 2336-7 (2000). "Two requirements must be met before _Miranda_ is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *U.S. v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). "The Supreme Court has instructed that a person has been taken into custody whenever he 'has been deprived of his freedom of action in any significant way.'" *Id.* at 1463 (quoting *Miranda* at 444). "The only relevant inquiry is 'how a reasonable man in the suspect's position would have understood his situation.'" *Id.* (Quoting *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984). The inquiry is an objective one from the suspect's perspective; the subjective views of the suspect and the officer are not relevant to the analysis. *Stansbury v. California*, 511 U.S. 318, 323-26 (1994). The factors that could lead a reasonable person to believe that he is not free to disregard the police officer are:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.

*U.S. v. Sanchez*, 89 F.3d 715 ,718 (10th Cir. 1996). Other factors which enter the analysis are "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will," "the nature of the questioning," and circumstances showing a "police dominated" atmosphere. *U.S. v. Griffin*, 7 F.3d 1512, 1517-18 (10th Cir.

1993).  Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances.  *See United States v. Soto,* 988 F.2d 1548, 1555 (10th Cir. 1993) (citing *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *United States v. Ward*, 961 F.2d 1526, 1529 (10th Cir.1992)).

    <u>D.</u>    <u>The Scope of Search Warrants</u>

Probable cause for a search exists if known facts and circumstances would lead a reasonable person to believe that the search would reveal incriminating evidence.  *U.S. v. Chavez*, 812 F.2d 1295, 1299 (10th Cir. 1987).  Officers executing a search warrant of a particular premises may not search a person found on the premises absent individualized probable cause. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).  Probable cause which supports the issuance of a search warrant for the premises does not, without more, support the search of the defendant found at the premises.  *US v. Sporleder*, 635 F.2d 809, 813 (10th Cir. 1980).

## DISCUSSION

*I.    Jurisdiction*

Count 1 charges a conspiracy to violate 42 U.S.C. § 6928(d) (attached at Tab 3).  This is the criminal enforcement mechanism of the Resource Conservation and Recovery Act ("RCRA"). The remaining charges addressed in Ohiri's Motion, Counts 2-7, 9-19, and 21-23, charge substantive violations of that same provision.  Ohiri argues that § 6928(d) has been supplanted in New Mexico by NMSA § 74-4-11, rendering § 6928(d) unenforceable in New Mexico.

While Ohiri admits that it is usually federal law that preempts state law, he argues that the RCRA explicitly supplants federal enforcement mechanisms with EPA-authorized state hazardous

waste programs. The authority for this proposition comes from the language of 42 U.S.C. § 6926(b) . Specifically, Congress has stated that if the EPA authorizes a state to operate its own hazardous waste program, then that program can operate "in lieu of" the federal program. 42 U.S.C. § 6926(b). The process for receiving such authorization is stringent — state criminal enforcement and fines must be sufficiently harsh for a state to receive EPA authorization to operate its own program. At first reading, the language of 42 U.S.C. § 6926(b) and § 6928(d) do seem to contradict each other on this matter:

> Section 6926(b) states, in relevant part, that an authorized state is "authorized to carry out such program *in lieu of* the Federal program under this subchapter in such State and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste (and to enforce permits deemed to have been issued under section 6935(d)(1) of this title) . . ."

It goes on to say that a state program will lose its authorization if, inter alia, it "does not provide adequate enforcement of compliance with the requirements of the subchapter." (emphasis added.) This language does not specify limitation to civil enforcement. Section 6928(d), however, states that:

> any person who. . . knowingly generates, stores treats, transports, disposes of, exports, or otherwise handles any hazardous waste. . . and who knowingly destroys, alters, conceals, or fails to file any record, application, manifest, report, or other document required to be maintained or filed for purposes of compliance with regulations promulgated by the Administrator *(or by a State in the case of an authorized State program)*, under this subchapter; shall, upon conviction, be subject to . . . (emphasis added.)

Thus, while the plain language of § 6926(b) appears to allow authorized state criminal enforcement mechanisms to supplant ("in lieu of") the federal criminal enforcement mechanisms of § 6928(d), the plain language of § 6928(d) clearly evinces Congressional intent for the § 6928(d) *federal* penalties to apply to those who fail to comply with authorized State programs.

One reading of the language of § 6926(b) allows these statutes to be harmonized, by separating two clauses in § 6926(b) by a comma. This reading shows that Congress intended for the state programs to generally supplant the federal program, while retaining concurrent federal jurisdiction over enforcement. It would read, "Such State is authorized to *[(a)]* carry out such program in lieu of the Federal program under this subchapter in such State*[,]* and *[(b)]* to issue and enforce permits for the storage, treatment, or disposal of hazardous waste (and to enforce permits deemed to have been issued under section 6935(d)(1) of this title) . . ." This reading would have the words "in lieu of" apply generally to hazardous waste programs, but not to enforcement of such programs. This interpretation is preferable, as it allows § 6926(b) and § 6928(d) to logically co-exist, and does not render superfluous § 6928(d)'s language allowing federal enforcement of violations of authorized state programs. *See Bridger Coal Co./Pacific Minerals, Inc. v. Director, Office of Workers' Comp. Programs*, 927 F.2d 1150, 1153 (10th Cir. 1991) (the Court "will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous").

In support of his position, Ohiri asserts that the EPA itself has pronounced that "the only hazardous waste program in effect in that state is the state program, and the state laws and regulations are those which must be enforced by EPA should federal enforcement be necessary." Memorandum, *EPA Enforcement of RCRA-Authorized State Hazardous Waste Laws and Regulations* at 5, (March 15, 1982). The Memorandum goes on to say that the intent of Congress in drafting the RCRA was the phasing out of dual enforcement. However, had Congress intended a complete supplanting of federal authority, surely it would have removed the

language of §6928(d) which explicitly provides for federal criminal penalties for violations of authorized state programs.

The Tenth Circuit has not addressed this issue in the criminal context, and expressly left open whether the EPA can bring civil enforcement actions in an authorized state:

> [B]ecause the propositions set forth above are not in dispute in this appeal, we assume without deciding for purposes of this appeal (1) that the EPA may enforce the state's hazardous waste regulations, *see United States v. Marine Shale Processors*, 81 F.3d 1361, 1367 (5th Cir.1996) ("42 U.S.C. §6928(a) gave EPA the power to enforce the substance of an approved state's program against private parties in that state."); and (2) that the EPA may do so even after the state has taken its own enforcement actions, *but see Harmon Indus., Inc. v. Browner,* 19 F.Supp.2d 988, 994, 996 (W.D.Mo.1998) (recognizing that EPA could withdraw state authority or enforce a violation of RCRA "when the state remains inactive, after giving notice" pursuant to 42 U.S.C. §6928(a)(2), but holding that EPA may not overfile under RCRA after state concludes enforcement action on same matter).

*U.S. v. Power Engineering Co.*, 191 F.3d 1224 (10th Cir. 1999). However, two other Circuit Courts have ruled directly on this matter. *U.S. v. MacDonald & Watson Waste Oil Company*, 933 F.2d 35 (1st Cir. 1991); *U.S. v. Elias,* 269 F.3d 1003 (9th Cir. 2001). Both Courts have held that EPA authorization of a state's hazardous waste program is not sufficient to preempt federal prosecution under 42 U.S.C. § 6928(d). The *Elias* Court found that "under the RCRA, the federal government retains both its criminal and its civil enforcement powers. . . [w]hat changes, and what is supplanted by state law, is the definition of hazardous waste and the sovereign from whom the generators must obtain the necessary permit originally. . .." *Id.* at 1013.

Ohiri urges this Court to decline to follow the reasoning of the Ninth and First Circuits, and instead offers the rationale of *Harmon Industries v. Browner*, 191 F.3d 894 (8th Cir. 1999). Ohiri's reliance on *Browner* is not compelling. *Browner* addresses concurrent civil enforcement

by the federal and state government. (Attached at Tab 5.) In *Browner*, the Court found that "the administration and the enforcement of the program are inexorably intertwined," and that the "in lieu of" language addresses both. Thus, the *Browner* Court held that state enforcement mechanisms supercede its federal counterpart.

*Browner* is, however, a case about *civil* enforcement. The distinction between the civil and criminal components of the RCRA are important to note. For example, although § 6928(a)(2) requires the EPA to give notice to a state with an authorized hazardous waste program before filing a civil action to enforce the RCRA, such language is conspicuously missing regarding pre-notification for criminal enforcement. This exclusion, considered in light of the language of § 6928(d) (which provides federal criminal penalties for violations of authorized state regulations), demonstrates that Congress did intend for the federal government to retain criminal enforcement authority in states operating authorized programs, such as New Mexico.

The Ninth Circuit further stated that "the position of the Eighth Circuit in *Browner* is not that the federal government loses its civil enforcement power after a state program is authorized. The Eighth Circuit concludes only that the federal government loses its primary role in enforcing hazardous waste regulations. Thus understood, *Browner* does not support Elias's contention that federal law is supplanted or that the United States lacks power to try him." *Elias* at 1011 (citations omitted). Other courts have simply declined to follow *Browner,* holding that concurrent state and federal enforcement of the civil provisions in the RCRA was contemplated by Congress. *See, e.g. U.S. v. Power Engineering Co.*, 125 F.Supp.2d 1050 (D. Colo. 2000). This Court agrees with *Elias* and holds that the RCRA provides for federal criminal prosecution of alleged violations of the RCRA.

## II.	Motion to Suppress

In response to Mr. Ohiri's Motion to Suppress, the government briefings and oral argument offer two justifications for the admissibility of the evidence in question: 1) the item retrieved from Mr. Ohiri's person was covered under the warrants validly obtained to search GWC, and 2) exigent circumstances required that Mr. Ohiri be searched without a warrant for his person.  The government has not argued that the evidence emerged subsequent to a consensual encounter in Mr. Ohiri's office, and apparently concedes that when Agents Jackson and Green directed Mr. Ohiri to empty his pockets while inside his office, this constituted a warrantless search of his person.   The Court will address each exception to the warrant requirement raised by the government, and then turn to Mr. Ohiri's Fifth Amendment claim.

### A.  Scope of Search Warrants

The first question this Court must ask is whether the scope of the warrants covered a search of  Mr. Ohiri's person.  In *U.S. v. Sporleder*, 635 F.2d 809, 813 (10th Cir. 1980), the Tenth Circuit found that probable cause which supports the issuance of a search warrant for the premises does not, without more, support the search of the defendant found at the premises.

> Our determination that the search warrant was valid only justifies a search of the premises. . . The warrant does not authorize the search of defendant or any other person. The search warrant and its supporting affidavit are directed only to "premises." Consequently, the methamphetamine discovered on defendant's person should have been suppressed unless the warrantless search that produced it comes within one of the "few specifically established and well-delineated exceptions" to "the most basic constitutional rule in this area ... that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment.' "

*U.S. v. Sporleder*, 635 F.2d 809, 813 (10th Cir. 1980) (citing *Coolidge v. New Hampshire*, 403

U.S. 443, 454-55, 91 S.Ct. 2022, 2031-32, 29 L.Ed.2d 564 (1971); *Katz v. United States*, 389

U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) ).

In *Sporleder,* the defendant was located on the premises to be searched, and the police

patted him down and located a small bag of methamphetamine.  The facts before the Court differ

slightly.  Mr. Ohiri was suspected by Agent LeScouarnec of taking a piece of property covered

under the warrant and placing it in his pocket.  In *Ybarra v. Illinois*, 444 U.S. 85, 102 (1979),

Chief Justice Rehnquist wrote in dissent that "[a]n absolute bar to searching persons not named in

a warrant would often allow a person to frustrate the search simply by placing the contraband in

his pocket.  I cannot subscribe to any interpretation of the Fourth Amendment that would support

such a result . . ."   But the government is not forced to choose between obtaining necessary

evidence and doing violence to the Fourth Amendment.  The use of appropriate law enforcement

procedures would allow for the Chief Justice's concerns to be allayed while still honoring the

imperatives of the Fourth Amendment.  Here, for example, the government could have briefly

monitored Ohiri while it sought a warrant to search Mr. Ohiri by traveling the short distance to

the federal courthouse.

It is precisely this type of temporary detention that was held to be constitutional in *Illinois

v. McArthur*, 531 U.S. 326 (2001).  In *McArthur,* police officers came to the home of a defendant

in order to "keep the peace" while his wife left the premises with her belongings.  Upon her

departure, she notified the police that the defendant kept marijuana in the home.  Pursuant to this

information, they restrained the defendant from entering his home for a two-hour period, during

which the police obtained a search warrant.  The rationale for this temporary seizure was to

prevent the defendant from destroying the evidence. The Supreme Court found this detention reasonable.

> [T]he police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy. They neither searched the trailer nor arrested McArthur before obtaining a warrant. Rather, they imposed a significantly less restrictive restraint, preventing McArthur only from entering the trailer unaccompanied. They left his home and his belongings intact — until a neutral Magistrate, finding probable cause, issued a warrant. . . [T]he police imposed the restraint for a limited period of time, namely, two hours.

Although the Government would have been briefly inconvenienced by utilizing such a procedure, the Constitution would have been honored without any loss of evidence. This Court therefore finds that as the warrants did not cover the search of Ohiri's person, the evidence obtained from his pockets is not admissible under the rationale that the it was obtained pursuant to the warrants issued in this case.

### B. Exigent Circumstances

The next inquiry this Court must make, then, is whether the warrantless search fell within one of the exceptions to the warrant requirement. The Government argues that the exigent circumstances exception allowed for the warrantless search of Ohiri's person.

The Government first argues that immediate action was required to prevent Mr. Ohiri's destruction of the hazardous waste label. Exigent circumstances exist if there is imminent danger of the destruction of evidence. *See Cupp v. Murphy*, 412 U.S. 291, 294-96 (1973). The Tenth Circuit has held that such circumstances exist when there is a "likelihood that notice would result in the destruction of evidence." *United States v. Dahlman*, 13 F.3d 1391, 1398 (10th Cir.1993). A set of facts analogous to those presently before this Court arose in *Munz v. Ryan*, 752 F. Supp. 1537 (1990). In *Munz,* the police obtained a valid warrant for a search of a home in order to

locate stolen bills bearing identified serial numbers. The government argued that exigent circumstances arose when the defendant, present in her home at the time of the search, requested to use the bathroom. They subsequently conducted a strip search without a warrant. The government argued that the defendant's use of the bathroom would have afforded her the opportunity to destroy any evidence they suspected she might have had on her person. The homeowner brought suit under 42 U.S.C. §1983. The District Court of Kansas, J. Theis, held the following:

> The court cannot agree that this search was a necessary response to an "exigent circumstance." It is, of course, firmly established that the fear of destruction of evidence . . . " is justification for what would be otherwise illegal absent an exigency or emergency." To fall within this exception, however, the "warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.' In this case, the officers had secured the area and could have prevented plaintiff from destroying evidence by means other than subjecting her to a search of her person — such as refusing her request [to use the bathroom] or obtaining a second warrant for her person. The court is unwilling to expand this limited exception to a situation that presented no genuine need for immediate police action. . . In this case, the police had every opportunity to obtain a warrant for the search of plaintiff's person, both at the time when they made the original application, and when they thereafter realized that plaintiff might be concealing evidence of the crime on her person. Considering all of the circumstances confronting these officers, including the gravity of the offense, the court cannot say that this warrantless search of plaintiff was justified as an "exigent circumstance."

*Id.* at 1545 (citations omitted). Here, temporary detention while a warrant was obtained, including police denial of the defendant's request to use the bathroom, was found to have been the constitutional alternative to a warrantless search of her person. In the present case, the defendant could easily have been similarly monitored in order to prevent him from destroying the evidence in his pocket while a warrant was obtained.

Exigent circumstances also exist if the warrantless search is necessary to protect the safety of law enforcement officers or the public. *United States v. Erb*, 596 F.2d 412, 417-20 (10th Cir. 1979). The government argues that the nature of the evidence involved, toxic waste, required that a search of Mr. Ohiri be conducted in order to determine the type of toxicity contained within the 55 gallon barrel. Specifically, the government argues that the agents needed the label to determine whether the barrel held materials that were potentially hazardous to the health or safety of the officers or the public prior to opening the barrel.

This assertion would be persuasive if the record had shown some immediate need to open the barrel. However, the record revealed that the EPA agents did not open the barrel until at least four hours after learning that Mr. Ohiri had allegedly removed the hazardous waste label from the drum. This was well after the amount of time it would have taken to retrieve a warrant to search Mr. Ohiri. Even without a warrant, the agents did not feel it was necessary to open the barrel in an expedited fashion. There was no argument that the EPA agents determined that waiting two hours to open the container would have put the agents or the public in danger. Therefore, neither the safety of the officers nor that of the pubic required immediate opening of the barrel, and therefore no exigent circumstances related to officer or public safety necessitated the warrantless search of Mr. Ohiri.

Furthermore, the government failed to uphold its obligation to utilize the least intrusive means of executing the search of Mr. Ohiri under allegedly exigent circumstances. "[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation,' *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (citing *Terry v. Ohio*, 392 U.S., at 25-26); *United States v. Jeffers*, 342 U.S. 48, 52 (1951). "The time necessary

to obtain a warrant is relevant to the determination whether circumstances are exigent. Therefore, courts should consider the amount of time required to obtain a telephone warrant in assessing the urgency of the situation." *United States v. Cuaron*, 700 F.2d 582, 589 (10th Cir. 1983). "[T]rial courts must consider the availability of a telephone warrant in determining whether exigent circumstances existed, unless the criminal nature of the circumstances clearly prevented the effective use of *any* warrant procedure." *Id.* (emphasis in original). The government "bears the burden of submitting evidence regarding the availability of a telephone warrant and the time necessary to obtain one." *Id.* EPA agents testified at the evidentiary hearing that despite having a prosecutor on telephone standby during the search of GWC, and despite the search's proximity to the courthouse, no attempt to receive legal advice or to receive a telephonic or conventional warrant was made prior to asking Mr. Ohiri to empty his pockets. (R. at 155-158.)

During a recess in the evidentiary hearing, the parties contacted New Mexico Magistrate Judge Lorenzo Garcia, a to clarify the requirements for receiving a telephonic warrant and obtain his guidance on the feasibility of having obtained such a warrant during the search of GWC. Pursuant to this conversation, counsel for both parties agreed that Judge Garcia stated that a telephonic warrant would not have been granted because of lack of unusual circumstances in this case. Specifically, Judge Garcia stated that the proximity to the courthouse and the fact that the search was occurring during working hours led him to believe that a telephonic warrant was unnecessary, and that a conventional warrant should have been sought instead. Counsel for both parties also stated that Judge Garcia estimated that the process of obtaining a warrant would have taken between five minutes and two hours, depending on the issuing Judge and the amount of information stated in the affidavit. A one- to two-page affidavit was estimated by Judge Garcia

to take only a few minutes.   Furthermore, the parties stated that Judge Garcia explained that the facts in this case would have deterred him from issuing a telephonic warrant, "in part because the person to be searched could be detained while somebody actually came to the courthouse and got a warrant."(R. at 175-176.)

Certainly, a temporary detention of Mr. Ohiri while the agents sought a telephonic warrant, or a conventional warrant, would have been constitutionally valid.  The Supreme Court has never "held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."  *Illinois v. McArthur*, 121 S.Ct. 946 (2001).   A temporary detention of Mr. Ohiri in order to obtain a warrant would have lasted no more than two hours.   In considering the appropriateness of this approach, this Court notes that the evidentiary hearing testimony states that search was being conducted "a couple of miles from the Courthouse" (R. at 213-214) and accepts the parties' estimate of an additional hour added to the warrant process attributed to travel to and from the courthouse and docketing time.

*Illinois v. McArthur*, 531 U.S. 326 (2001) allows a warrantless detention of an individual for  up to two hours.  Within this time period, the agents could have lawfully detained Mr. Ohiri and traveled to the Albuquerque courthouse in order to obtain a warrant to search Mr. Ohiri's person. Given that this was a viable approach of least intrusive means, and due to the fact that no exigent circumstance of safety or potential destruction of the evidence existed, this Court finds

that the agents' request that Mr. Ohiri empty his pockets was impermissible. As a consequence, the fruits of this search must be suppressed.[1]

### C. Defendant's Fifth Amendment Claims

Mr. Ohiri claims his act of producing the hazardous waste label and his subsequent comments should be suppressed because they were elicited through custodial questioning in violation of his Fifth Amendment rights. He claims that the act of producing the hazardous waste label was a testimonial act, and that the object and the comments he made upon producing them were elicited without a recitation of his rights, in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966).

This Court need not reach Mr. Ohiri's Fifth Amendment claims, as the contested acts and comments are inadmissible as fruit of the poisonous tree. To suppress evidence as the fruit of an illegal search, a two-prong test must be satisfied: (1) that the detention did violate his Fourth Amendment rights; and (2) that there is a factual nexus between the illegality and the challenged evidence. *Nava-Ramirez*, 210 F.3d at 1131 (internal quotations and citation omitted). "Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Id.* (citations omitted). In order to show such a factual nexus, "[a]t a minimum, [the defendant] must adduce

---

[1]The government has not argued that this was a search incident to an arrest. Agents stated at the evidentiary hearing that Ohiri was not placed under arrest. The government does not contend that there was independent probable cause to search Mr. Ohiri, but rather relies entirely on the exigent circumstances exception to the warrant requirement and the scope of the premises warrants.

evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *Nava-Ramirez*, 210 F.3d at 1131 (footnote and citation omitted).

It is clear from the record that Mr. Ohiri would not have volunteered the production of the label or made statements regarding the hazardous waste label found in his pockets had EPA agents not asked Mr. Ohiri to go into his office and empty his pockets. In sum, because this Court has determined that the appropriate method of obtaining the evidence from Mr. Ohiri's pockets required a warrant for search of his person, the hazardous waste label found therein must be suppressed. As a consequence, Mr. Ohiri's statements to law enforcement officers made at the time of emptying his pockets must also be suppressed as a fruit of the illegal search. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). As the matter is resolved on the Defendant's claim of a Fourth Amendment violation, the Court need not address Defendant's claims of a violation of his rights under *Miranda v. Arizona*.

**CONCLUSION**

**THEREFORE, IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss Counts 1-7, 9-19, and 21-23 for Lack of Subject Matter Jurisdiction and for Failure to Charge an Offense **[Doc. No. 17]** is **DENIED**, and the Defendant's Motion to Suppress Evidence **[Doc. No. 22]** is **GRANTED**.

Dated this 22nd day of February, 2002, in Santa Fe, New Mexico.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
Edwin Godley Winstead, AUSA

Attorneys for Defendant General Waste Corp.:
Peter V. Domenici, Jr., Esq.
Charles N. Lakins, Esq.

Attorneys for Defendant Ohiri:
John D. Cline
Nancy Hollander